We have four cases on the calendar this morning, a patent case from a district court, two patent cases from the PTO, and a case from the Court of Appeals, the CIT. The first case is CAVE Consulting Group v. OptumInsight, 2017, 1060 and 1093. Mr. Lancaster. Thank you, Your Honor. I hope to reserve five minutes for rebuttal. I represent Defendant Appellant OptumInsight, as you've observed. I'll call it Optum in this argument. I hope to focus on two issues here. First, the construction of the term weighted episodes of care, which was construed to include a statistical weighting method, direct standardization, that appears in the original specification only as a prior art method that is criticized and distinguished. But then, according to CAVE, that disavowal was erased by dependent claims that were added five years later. Second issue, the on-sale bar defense. After that defense was dismissed on summary judgment, what we believe to be that error was compounded by its complete exclusion from trial. We're talking about software that CAVE counsel described as, quote, no different in any way from the accused product. And it allowed CAVE to argue at trial that what Optum had done was copy its product, which was, in fact, developed far later. You characterize the invalidity argument as an alternative in the conclusion to your brief. Do we need to decide the invalidity issue if we were to agree with you on the claim construction? No, Your Honor. You do not. In many cases, obviously, there's a counterclaim for invalidity. There happens not to be in this case. It's solely a defense. So if the court were to agree with us on the weighted episode of care, it need not reach the invalidity issue. And so to deal with that issue, which we agree can be dispositive. Two arguments support non-infringement because there's agreement between the parties that Optum uses direct standardization. And if either of those arguments is resolved for Optum, the case is over. The disavowal language in this specification... Before you get into the language, I confess I'm a little unclear about what is actually going on here. To determine physician efficiency, what are we talking about? The cost of treatment, the need for repeat treatment, or both, or all of those? It could be all those things and a few other variables, too. It could be a number of variables, and it's put to use by a number of different potential users. Here, the focus of the market is the payer market, but it can be used for a variety of different purposes. And this technology is really a part of the medical system almost no matter what area you're in. Social Security, Medicare, Medicaid, kind of analyzing physician efficiency is a crucial part of the entire medical system. So both the direct and the indirect method are comparing the physician's experience to a peer group? Correct. That's correct. But the difference between direct and indirect is whether you are determining the makeup of the physician's practice by his own experience or whether you're using a peer group. Is that correct? Right. So the Optum method focuses on the physician's actual experience. What CAVE calls the indirect method is it turns that actual experience into a model that excludes a number of individual episodes that might add to a number of individual episodes so that the individual physician's case makeup and case results match the CAVE model. Okay. That's how it's used. You said we may not have to decide the on sale issue, but as far as that defense is concerned, you've got a confidentiality problem, right? We have a confidentiality problem to the extent confidentiality determines the issue. Well, it couldn't be invalid on the ground of public use. There is a fact issue, we believe, as to public use. What the Court needs to keep in mind is that this was resolved on summary judgment. And at the time before Helsin and Medicins, Optum thought that there was a fact issue. But this Court could not hold that the confidentiality of some terms of the disclosure removed it as prior art without overlooking the language in both Helsin and Medicins. Helsin is most blunt. It says an invention is made available to the public when there's a commercial contract to sell a product embodying the invention and that sale is made public. Here, the sales weren't only public, they were publicized. They were advertised. Our cases, to continue with the Helsin quote... But of course, this is a process, a method. They're both... The method was not sold. There are both... There's both a process claim... And a system. And a system claim. Both were found to be infringed. And what happens real world... But the system wasn't on sale. Not exactly, Your Honor. What happens, as the Court maybe appreciates, is much like the system that was found to be prior art in the ScalTech case, there is data that is received from the customer, processed in ways the details of which are confidential, but the overall method in outline is both requested by and provided to the customer, and then output in terms of these physician efficiency analytics go back to the customer. And in that way, we think it's quite analytic, quite analogous to the ScalTech case. Where in that case, there was waste that came into the processor, got processed in a certain way, the waste went back to the customer in a valued form, Coke in that case. That was found, even though the details of that method were not available to the customer, that was found to be an on-sale bar. Well, medicine suggests that the sale of the output of a method is a sale of a method. I'm sorry, once more, Your Honor? I say our in-bank decisions in medicine suggest that the sale of the output of a method is the sale of a method within the meaning of the on-sale bar. And we, of course, agree with that, as we have no choice. But what about in a systems claim? Is the output of a system a sale of a system? We think that the same analysis applies to both, and certainly at trial, the infringement issue was analyzed in exactly the same way. Exactly the information that I provided to you was argued to be and ultimately found to be both the system claim and the method claim. And so, in some cases, it could obviously make a distinction. In this case, it doesn't. Now, this court has said, following the Pfaff case, that policy justifications don't matter. But in this case, in medicines, the court analyzed or described policy justifications anyway. And in this case, the policy justification that looms largest for us is that this predecessor product, the same as the later product, was sold starting two years before the patent application. The buyers of that product understood that they were buying a product that was free to the public to use, consistent with the terms of their agreement with Optum. It wasn't until eight years later, when the patent issue, that they were first put on notice that, no, somebody claims that this is infringing. But you mentioned policy issues. Isn't the policy of the law that is opposed to someone who had an invention earlier and didn't publicize it? The later person who came in and utilized the patent system and disclosed the invention, the law favors such a person? That's not what either Helsin or medicines says, Your Honor. And I think that what Your Honor is focusing on is how, historically, some third-party claims, the claims of the use by the accused party, are treated differently. But it is hard to find that distinction in either medicines or Helsin. And the policy justification that I was trying to describe was the policy of discouraging the removal of inventions from the public domain. And that's exactly what happened here, Your Honor. This case seems to us to be analogous, I mentioned before, the Skaltech case, but also the Evans case, where the user in question, raising the 102 issue, was the accused party, was the defendant. And that's the case in which the court set out the rule that is also applicable here if the accused product is the same as the product that was used before, that's sufficient to establish a 102 defense. Could I bring you back to the infringement issue? Please. As I understand it, your contention is that the specification discoins the direct approach, right? Correct. And then I guess it was claims, what is it, 22 and 29 or whatever it is, that had claims for direct standardization, right? No, Your Honor. One oddity in this case is neither one of those claims includes the phrase direct standardization. That phrase is only included in unasserted claims. And those unasserted dependent claims are the claims that were added 5 years later. 27 and 28. Among them, 27 and 28. I think it's not 28. I think it's 22 and 27 or 29. But you're talking about the same thing, two independent claims. Those were the two claims that were asserted. And, as I say, it's the unasserted claims that were added later that included the language direct standardization. So when the application was filed, no such phrase appeared anywhere in the application or the claims. I see that I have four minutes left and I wonder. Hold on. So 22 is one of the asserted claims, right? Yes. And then so then 27 and 28 are added dependent claims to 22. And I guess the argument is if 27 and 28 describe direct standardization, that that must be something that's also covered by claim 22. That's the argument. Those claims weren't asserted. It's 22 and 29 that were asserted. But those unasserted claims, if those undo the disavowal, then you have to reach the written description arguments that we also set out in our brief. Okay. Can I ask you just one quick question? And I think you were, in responding to some questions about the on-sale bar, you were talking about 22 is a method claim, 29 is a computer-appropriate product claim. I don't know whether that's the same as a system claim or not. And then you reverted to how on the infringement side of the case, the infringement was treated identically. What was the nature of the activity accused of infringement? Selling? In Evans? I'm sorry, in Evans? No, in the case that we have in front of us right now, when the other side asserted infringement, was it by your selling something? Yes. Making it? Using it? What? The focus was on selling. And so the damages were measured by the number of customers and the sales to those customers. You sold your computer product? Eventually, yes. But pre-software was sold. But pre-application, the software was not in itself sold. It was rather data comes in, software processes it, different process, data goes back. And may I reserve my last couple minutes? We will give you three minutes, Brad. Thank you. Mr. Brophy. Good morning. I represent the Appalachia CC group, and I think I'm happy to chat about the items that Mr. Lancaster raised. I think first and foremost, picking up where Mr. Lancaster left off, it's important to understand that there was a flow of activity over time for this predecessor company, IHCIS, which eventually became OpMinsight. During the period prior to the 126 patent being filed, they did not have a product to sell. The only thing they could do is take in data from a customer, run that data internally, and deliver the output, the results, to a customer. They did not license the software. They didn't give a CD to someone. Is that a sale of the method under medicines? It is a sale of the method insofar as the patentee is concerned. There's a fundamental distinction between a patentee sale and a third-party, completely disconnected third-party sale. In this instance, OpMinsight was completely separate from CC group. Well, let's put it this way. You agree, do you not, that if this sale had been made by the patentee, that the on-sale bar would apply? I do not agree, Your Honor, but for a different reason than I think you suspect. The reason I don't agree is that one of the issues we raised on appeal is that the prior art reference, which we're calling impact analysis, is actually a Frankenstein of five different documents from different time periods which both parties admitted deal with multiple methodologies. They do not relate to the same methodology. And so there is no impact analysis prior art. There's a conglomerate. Putting that aside, if there is impact analysis prior art, you agree that if this sale had been made by the patentee, that the on-sale bar would apply? I agree with respect to the method claim, which is claim 22, but not with respect to claim 29, which is a product claim. What's the difference? One of them is a product tangibly embodied in computer code, so it's like a CD, for example, that you would sell. And there was no sale of a CD. There was no product of that variety to sell. And so unless we're going to ignore entirely the fundamental distinction between those different types of claims, there has to be some meaning behind that. And in my mind, the meaning is one of them is a method of use. The other is a product claim. I agree with you that under this Court's jurisprudence, when a patentee offers something for sale that is the result of a method, that that triggers the on-sale bar. I do not agree, however, that that relates to this case because we're dealing with a third-party use. And there are fundamental distinctions in the policy behind enforcement of the on-sale bar in this situation. Well, the problem is that we have cases, including medicines and health and both, which say that the on-sale bar applies to third parties. And my view of that is, and I think if you look at those decisions and the facts underlying those decisions, the third parties that are referenced there are third parties that are somehow in league with the patentee. So, for example, the patentee doesn't make a sale. In league with or connected in some way. So, for example, a third party works closely with the patentee, obtains information about the invention, and then goes off and sells it without the inventor objecting. But we have to look at statutes. We're looking at the old statutes. We're not talking about A, known and used by others. B talks about in public use or in sale without any distinction between by the inventor or by a third party. So, my view of that goes all the way back to the 1800s in the Pennock case, which discusses the entire purpose of the on-sale bar. And the purpose of the on-sale bar, as they recognize there, is when the patentee is in control of the timing of his or her own commercialization, there should be a heightened standard for them. So, in other words, we're going to provide an exception to the normal rule that the public must be conferred knowledge of the invention in this circumstance in which the patentee has control over the timing of his or her commercialization and decides to go ahead and commercialize. That is fundamentally distinct from this case in which we had no control over OptumInsight's commercialization. And so the on-sale bar simply doesn't apply to this situation. But the cases say otherwise. The cases say it does apply to third-party sales. The cases, number one, the Helsin and Medicines case, exclusively deal with sales by the patentee. And as I mentioned, the third parties... They speak to third-party sales also. And I guess my reading of that, Your Honor, is that those third parties are, as I said, in league with or somehow affiliated with the patentee. And the body of case law is filled with examples of the patentee not taking a step, the third parties taking a step with the patentee's knowledge, awareness, acceptance. What about 102G? Why does 102G apply? The Fox Group case requires that for 102G, the lack of concealment requires that the thing that is not concealed is what the invention actually claims. In other words, the thing that... But is a confidentiality agreement the same thing as concealment? Concealment seems to be addressed to a large extent to the question of commercialization. In other words, you keep your invention secret and you don't commercialize it. Whereas here, it was commercialized. And why does this fit within concealment? I'm having some difficulty with that. The purpose behind concealment, the question of concealment, and really the purpose behind all of this, is the fundamental policy of making sure that the public gets access to knowledge of inventions as quickly as possible. And 102G is not served by an interpretation that allows private secret sales ensconced within confidentiality agreements to satisfy the lack of concealment requirement. Well, the sale's not secret. What you're contending is that the details of the invention are kept... Exactly. And how does it benefit the public at large if a company is permitted to continue to sell a product in a way that doesn't confer knowledge to the public, but then use that sale later when someone comes along and discloses it through the patent process in a way that we want to encourage, but that person gets to invalidate this person's patent. Between those two people, and this is what Gore V. Garlock says, as between those two parties, we want to promote the party who is going to bring the invention to the public domain. And this person here, who offered it for sale in secret, didn't do that. And that's what Rescue Net says, that's what Gore V. Garlock says, which are both good law. We're not addressing the Helsin case. And again, I believe that's because the Helsin and Medicins Co. cases deal with third parties that are somehow affiliated with the patentee. When you have a true third-party sale, it simply cannot be that the private commercialization of that third party acts as a prior art reference. One thing that I've been juggling in my mind, and I'll admit I don't exactly fully understand or appreciate the impact of this, but essentially what that means, if we were to interpret the on-sale bar in a reply to truly third-party sales, it would mean that that third-party sale can act as an anticipating sale, but can never be used as part of an obviousness argument. And I don't understand how that works, because the whole premise of 103 is that a 102 reference can also be used as a 103 reference. But in this situation, the 102 reference doesn't apprise the public of the knowledge of the invention, and so it can act as an anticipating reference, but can never act as an obviating reference. And that seems to be a fundamental conflict under the law. Could you address the infringement issue? Yes, certainly. If it weren't for these dependent claims, which I guess are 27 and 28, you would lose on the claim construction, wouldn't you? No, I disagree, Your Honor, and there are a number of reasons. First, the prosecution history itself includes statements from the inventor saying direct standardization was within the scope of my claims, and here's how it works. And under the Libel-Flarsheim case... Did that occur at the time that these dependent claims were added? It occurred in a rejection shortly after those dependent claims were added. Okay, so it wasn't part of the original prosecution. It wasn't, Your Honor. Well, I shouldn't say original prosecution, because it was part of the original prosecution file. But Libel-Flarsheim says that for purposes of claim construction, you take the patent and the record as it was issued. You do not look at it at the time it was filed. You look at it at the time it was issued. And that is, I think, pretty clear under the law, because prosecution plays a role in the claim construction process. And so we can't simply ignore, and I know the appellant characterizes these as late-added claims. These weren't late-added claims. We added these claims as part of the prosecution process in the original case. So they weren't late-added. And anything that takes place in the prosecution bears on the meaning of the claim terms as they're construed by the court. And the reason for that is, that entire record is what informs the skilled artisan as to what is inside and outside the scope of the invention. So I think I'm looking at the right place. This is Appendix Page 850. That's the... We have just the one page, so it's not very informative. Where it says, Claim 27 was rejected for citing direct standardization. The examiner considered it unclear how the calculation utilizes direct standardization. And then you say, the direct standardization method utilizes each physician's episode distribution weight to calculate physician and peer group statistics. There was no apparent recognition on the examiner's part that there was even a question as to whether there had been a disclaimer in the spec that error number two about all the prior art was essentially the use of direct standardization, as you have now called it. And the statement, quite an explicit statement in the specification about what the invention requires. Don't you think more in the prosecution history than this should be needed to overcome what we would in these circumstances otherwise, I think, find a very clear disclaimer in the spec? So I have a couple thoughts with respect to that. First of all, your absolute software case states that when a party uses the phrase present invention in a haphazard way... This is not haphazard. It depends what verb comes after it, but the verb is pretty strong here. I think that there are three things that I would say to that. One, we have claims, dependent claims, that explicitly bear on direct standardization. So a skilled artisan reading the patent would not believe that there was a clear and unequivocal disavowal of scope because the inventor has claims directed to that exact embodiment. Number two, the... But how does that square with the notion that disavowal, if clear enough, can overcome what is otherwise absolutely plain on the face of the claim, not even a question of interpretation? So the second, and that's a good question. The second thing is we have to look very carefully at what the specification says. And both experts in this case agree to this, by the way. And this was testimony that came out at trial as well. The second error that's identified in the patent, it does not say the invention does not work when you do this. It doesn't. What it says is, and their expert agreed to this at trial, what it says is in certain circumstances when you have low data volume, when the number of claims that you're analyzing is small, the use of direct versus indirect can harm, can result in errors. It is not saying the invention doesn't work with this. It's saying in certain circumstances... Right, but why doesn't it say, and I guess this is particularly on column 92, the system of the present invention uses an indirect standardization technique for weighing together, et cetera. Why doesn't that say in clear terms, we know that other people have been using direct standardization, but that's not our invention, even though the other one works. So direct and indirect, as it sounds like you appreciate, have been around for decades. And there is no dispute by those skilled in the art that either one works. The notion of weighting comes with it, direct and indirect standardization, and everyone knows it. It's as simple as... I don't think that's necessarily the case. I mean, the specification here is saying that direct standardization doesn't work well in some circumstances. In some circumstances, yes. But that is not a clear disavowal to someone skilled in the art, because as OptumInsight's expert even agreed, when you look at this, he understands this to say that only in certain circumstances does this lead to error, not that you simply can't use it. And if you have large data volumes, which many health plans do, you're perfectly fine using direct standardization. And everyone's known that for a very long time. And so this is not a situation where no one knew what direct standardization was or whether it would work or not. This is straightforward math. So what do we do if we disagree with you? Do we think this is a clear disavowal? Do we lose then? I don't think so, Your Honor. First of all, I don't know, and obviously this is up to you and not to me, but I don't understand how there can be a clear disavowal to a skilled... You're arguing my premise. I'm saying let's assume hypothetically that we disagree with you and say that there is a clear disavowal of direct. Do you lose? Your Honor, I don't know that, and the reason is this was determined at claim construction at the beginning of the case. And so we directed our entire fact discovery in this case with the understanding that it covered both. And so we did not press on all the ways in which this software might satisfy the indirect standardization form of weighting. So unfortunately, we just don't have the record for me to answer that question. Did you argue in your brief that a remand is required if we disagree with you on the claim construction? I do not believe so, Your Honor. I think our position was simply that this argument should fail. Any final thoughts, Mr. Boffi? Uh, I don't think so. Thank you all very much for your time. Thank you. Mr. Lancaster will give you three minutes for rebuttal, if you need it. Two, I think, very brief points, Your Honor. Just as to the commentary of the experts on the weighted episode of care issue, if the court were to look at the testimony of the Optum expert, Thomas, you would see that his clear testimony was that there was not support for direct standardization within the patent. But, of course, we have to leave that to the record. The second point that I wanted to make was the Section 102 point, which, as Your Honor observed up front, is not an issue that the court need reach if it resolves the infringement issue. But I wanted to remind the court of the view of this product-process distinction that Cave Counsel took at trial. And that view, again, was, quote, this is not a different alternative, referring to the earlier product. This is telling the story of the accused product, close quote. Not just process, product. That's on Appendix 11821. And that was a key part of Cave's arguments at trial. It seems apparent that Cave's argument stands or falls on this third-party distinction with the court has already inquired about, a distinction that you can't find in Helsin or medicines. But maybe more to the point, it's a distinction that you can't find in the Supreme Court's FAF decision and the emphasis on looking at the language of the statute. When you run through 102, and one of the members of this panel already observed it, there are many parts of 102 that focus on which party is relevant to that particular section. Not so for on sale. There is no limitation within this patent, within the statute. And so it does seem that this is a pretty pure case of what is perhaps the fundamental rule of patent litigation, that which infringes if after, invalidates if before. And for that reason, we ask for the relief that we requested. I have one more question for you. Let's suppose hypothetically that we were to agree with you on the claim construction. They now argue for the first time, apparently not raised in the brief, that that should result in a remand rather than J-Mall in your favor. What's your answer to that? I don't understand what the issue would be, Your Honor, because there was agreement throughout the case, including at trial, that the method that Optum used was direct standardization. There was no fact issue left to be resolved by the district court. That's part of the record as an agreement between the parties. So you have the claim construction excluding direct standardization. You have the agreement that that's what Optum practices. That should be the end of the case, Your Honor. Okay. Thank you. Thank you. Mr. Lancaster will take the case under review.